No. 24-1083

In the United States Court of Appeals
for the Third Circuit

———————————————

EUGENE DAVIS, in his capacity as Liquidating Trustee of the Venoco
Liquidating Trust,

*Plaintiff-Appellant,*

v.

THE STATE OF CALIFORNIA and THE CALIFORNIA STATE LANDS
COMMISSION

*Defendants-Appellees,*

———————————————

Appeal from the United States District Court
for the District of Delaware

———————————————

**BRIEF OF APPELLEES CALIFORNIA STATE LANDS COMMISSION
AND THE STATE OF CALIFORNIA**

Rob Bonta
Attorney General of California
Christina Bull Arndt
Supervising Deputy Attorney General
Mitchell E. Rishe
Deputy Attorney General
OFFICE OF THE CALIFORNIA
ATTORNEY GENERAL
300 S. Spring Street, Suite 1702
Los Angeles, CA 90013
Telephone: (213) 269-6394
E-mail: Mitchell.Rishe@doj.ca.gov

*Counsel for the State of California*

David M. Fournier
Kenneth A. Listwak
TROUTMAN PEPPER LLP
Hercules Plaza, 1313 Market Street, Suite 5100
Wilmington, DE 19801
Telephone: (302) 777-6500
Email: David.Fournier@Troutman.com

Steven S. Rosenthal
Marc S. Cohen
John David Taliaferro
Alicia M. Clough
LOEB & LOEB LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Telephone: (310) 282-2000

*Counsel for The California State Lands
Commission*

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES ..................................................................1

STATEMENT OF RELATED CASES ..................................................1

INTRODUCTION ..............................................................................3

FACTUAL BACKGROUND..................................................................4

    A.    Appellees Are Public Agencies Tasked with Protecting the Public and Preventing Injuries to Human Health, Safety, and the Environment. ......................................................................4

    B.    The EOF Is, and Has Always Been, Inextricably Interconnected to Platform Holly and Necessary for Treating Toxic Gas Emanating from the Offshore Wells....................................5

    C.    Venoco Walked Away from Its Obligations to Maintain the EOF and Safely Treat H2S....................................................9

    D.    The Commission Contracted with ExxonMobil to Assist with Plugging and Abandoning the Wells Because Venoco Walked Away from Its Obligation to Do So.......................................14

        1.    Matters Outside Scope of This Phase I Agreement. .................15

    E.    The Bankruptcy Court Held that the Commission's Use of the EOF Was a Valid Exercise of Its Police Powers in Response to an Emergency. .................................................15

    F.    The District Court Affirmed the Bankruptcy Court's Judgment. ......................................................................16

STANDARD OF REVIEW ...............................................................16

SUMMARY OF ARGUMENT ...........................................................18

ARGUMENT ................................................................................21

I.    THE BANKRUPTCY COURT AND THE DISTRICT COURT CORRECTLY HELD THAT THE COMMISSION'S ACTIONS TAKEN FOR THE PROTECTION OF THE PUBLIC DO NOT GIVE RISE TO A COMPENSABLE TAKING UNDER THE

TAKINGS CLAUSES OF THE UNITED STATES AND
CALIFORNIA CONSTITUTIONS. ...........................................................21

A.    Longstanding Precedent Recognizes That No Compensable
Taking Arises From the Exercise of the Police Power Taken
to Protect Against Risks to the Public Health, Safety and
Environment. .......................................................................................21

    1.    There Was No Compensable Taking Arising Under the
Takings Clause of the Fifth Amendment to the United
States Constitution. .................................................................21

    2.    There Was No Compensable Taking Arising Under the
Takings Clause of the California Constitution. ........................28

    3.    Extensive Additional Authority Supports the
Conclusion that There Is No Compensable Taking in
the Circumstances of this Case. ................................................30

B.    Precedent Does Not Limit the Exercise of the Police Power
to Unforeseen and Imminent Risks of Injury to the
Community..........................................................................................32

    1.    "Emergencies" Do Not Represent the Only
Permissible Basis for a Non-Compensatory Taking.................32

    2.    The Bankruptcy Court Correctly Found that the
Commission's Actions Were Taken to Avert Public
Peril. ........................................................................................33

    3.    The Bankruptcy Court Correctly Found that
Government Action Does Not Have to Relate to
"Imminent" and "Unforeseen" Events to be Non-
Compensable............................................................................38

    4.    The District Court Correctly Found that the Existence
of an Emergency is a Factual Determination Reviewed
for Clear Error and Concluded that There Was No
Clear Error................................................................................39

C.     The Evidence Demonstrates that the Commission's Entry Onto, and Continued Presence On, the EOF Was an Appropriate Exercise of the State's Police Power. ............................40

II.     THE BANKRUPTCY COURT AND DISTRICT COURT CORRECTLY REJECTED THE EXXONMOBIL "POTEMPKIN VILLAGE," WHICH IN ANY EVENT WAS NEVER A "VIABLE" ALTERNATIVE TO THE COMMISSION'S USE OF THE EOF. ...................................................................................44

III.     ALTHOUGH THE TRUSTEE WAIVED THE ARGUMENT BELOW, EXTENSIVE PRECEDENT ESTABLISHES THAT THE STATE'S ENTRY ONTO PRIVATE PROPERTY THAT IS NECESSARY TO PROTECT THE PUBLIC DOES NOT GIVE RISE TO A COMPENSABLE TAKING.......................................48

A.     The Trustee Waived Below the Contention that Entry Onto the EOF was a Compensable Taking Because it Was "Unoffending Property." ....................................................49

B.     Extensive Legal Authority Upholds Entry Onto Private Property to Respond to an Impending Peril to the Community Even Though the Property Is Not the Site of or the Source of the Peril. ........................................................51

C.     The EOF is Not "Unoffending Property.".........................53

CONCLUSION...................................................................................55

COMBINED CERTIFICATIONS...........................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alves v. United States*,
133 F.3d 1454 (Fed. Cir. 1998) ........................................................17

*Aztec Minerals Corp. v. Romer*,
940 P.2d 1025 (Colo. App. 1996).....................................................31

*Bass Enters. Prod. Co. v. United States*,
133 F.3d 893 (Fed. Cir. 1998) ..........................................................17

*Brown v. Pa. State Emps. Credit Union*,
851 F.2d 81 (3d Cir. 1988) ...............................................................16

*Cal. State Lands Comm'n v. Davis*,
142 S. Ct. 231 (2021).........................................................................2

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021).................................................................23, 53

*Chi., B. & Q.R. Co. v. Illinois*,
200 U.S. 561 (1906)..........................................................................23

*City of Jersey City v. 108 Storms JC, LLC (In re Jersey City Cmty.
Hous. Corp.)*,
2024 WL 1254833 (3d Cir. 2024) .....................................................17

*Craig Patty & Craig Thomas Expeditors, LLC. v. United States*,
136 Fed. Cl. 211 (Fed. Cl. 2018) .................................24, 25, 26, 53

*Customer Co. v. City of Sacramento*,
895 P.2d 900 (Cal. 1995).............................................28, 29, 33, 34

*Davis v. California (In re Venoco, LLC)*,
998 F.3d 94 (3d Cir. 2021) ................................................................1

*Dekk Prop. Dev., LLC v. Wis. DOT*,
988 N.W.2d 653 (Wis. 2023)............................................................31

*Erie R. Co. v. Williams*,
    233 U.S. 685 (1914)..................................................................47

*Fertilizing Co. v. Hyde Park*,
    97 U.S. 659 (1878)..................................................................22

*In re Fruehauf Trailer Corp.*,
    444 F.3d 203 (3d Cir. 2006) ...............................................40

*Gloucester Ferry Co. v. Pennsylvania*,
    114 U.S. 196 (1885)................................................................26

*Goldblatt v. Hempstead*,
    369 U.S. 590 (1962)...............................................................22

*Hoke v. United States*,
    227 U.S. 308 (1913)..............................................................26

*Holtz v. Superior Court*,
    475 P.2d 441 (Cal. 1970).............................................19, 35, 36

*House v. L.A. County Flood Control Dist.*,
    153 P.2d 950 (Cal. 1944)...........................................*passim*

*Integrated Sols. v. Serv. Support Specialties*,
    124 F.3d 487 (3d Cir. 1997) ...............................................55

*Jacobson v. Massachusetts*,
    197 U.S. 11 (1905)..................................................................47

*Keystone Bituminous Coal Ass'n. v. DeBenedictis*,
    480 U.S. 470 (1987).........................................................18, 22

*Los Osos Valley Associates v. City of San Luis Obispo*,
    36 Cal. Rptr. 2d 758 (1994) ...............................................36

*Miller v. Schoene*,
    276 U.S. 272 (1928)..............................................................22

*Mugler v. Kansas*,
    123 U.S. 623 (1887)...........................................*passim*

*Nassr v. Commonwealth*,
  477 N.E.2d 987 (Mass. 1985) ...................................................................30, 31

*Nat'l. Bd. of Y.M.C.A. v. United States*,
  395 U.S. 85 (1969) ........................................................................................22

*In re Natal*,
  280 F. App'x 227 (3d Cir. 2008) ..................................................................50

*Odello Bros. v. County of Monterey*,
  73 Cal. Rptr. 2d 903 (1998) (rev den 1998 Cal. LEXIS 5381 *) ................37, 38

*Phila. Redevelopment Auth. v. Atuahene*,
  229 A.3d 1002 (Pa. Commw. Ct. 2020) .........................................................31

*Prop. Rsrv., Inc. v. Superior Court*,
  375 P.3d 887 (Cal. 2016) ...............................................................29, 34, 36, 52

*In re Pursuit Cap. Mgmt., LLC*,
  874 F.3d 124 (3d Cir. 2017) .........................................................................17

*In re Revstone Indus., LLC*,
  690 F. App'x 88 (3d Cir. 2017) ....................................................................51

*Rose v. City of Coalinga*,
  236 Cal. Rptr. 124 (1987) ......................................................................... 37-38

*Seed Co. v. Westerman, Hattori, Daniels & Adrian, LLP*,
  961 F.3d 1190 (D.C. Cir. 2020) (reh'g den 2020 U.S. App. LEXIS
  24032 *) ......................................................................................................17

*Smith v. Cnty. of L.A.*,
  262 Cal. Rptr. 754 (1989) (reh'g den 1989 Cal. App. LEXIS 1091) ................37

*Sonoma County Organization etc. Employees v. County of Sonoma*,
  1 Cal. Rptr. 2d 850 (1991) ............................................................................36

*Starzenski v. City of Elkhart*,
  659 N.E.2d 1132 (Ind. Ct. App. 1996) (cert den 519 U.S. 1028) .....................31

*Stewart v. Shubert*,
  325 F. App'x 82 (3d Cir. 2009) ....................................................................55

*Thousand Trails, Inc. v. California Reclamation Dist. No. 17*,
   21 Cal. Rptr. 3d 196 (2004) ................................................................37

*U.S. v. Charles George Trucking Co.*,
   682 F. Supp. 1260 (D. Mass. 1988) ...................................................53

*U.S. v. City of New Orleans*,
   86 F. Supp.2d 580 (E.D. La. 1999) ...................................................52

*U.S. v. Mountaineer Ref. Co.*,
   886 F. Supp. 824 (D. Wyo. 1995).......................................................52

*United States v. Fisher*,
   864 F.2d 434 (7th Cir. 1988) .............................................................52

*In re Upstream Addicks & Barker (Tex.) Flood-Control Reservoirs*,
   146 Fed. Cl. 219 (2019) ....................................................................38

## Statutes

42 U.S.C. § 4605 ...................................................................................43

42 U.S.C. § 7661 .....................................................................................6

2 Cal. Code Regs. § 2135..........................................................................4

Bankruptcy Code § 541 .........................................................................55

Cal. Gov't Code § 8574.1 .......................................................................43

## Other Authorities

Air Permit and Santa Barbara County Air Pollution Control District
   Rule 310 ...........................................................................................8

Cal. Const. art. I, § 19(a)........................................................................28

California Public Resources Code. JA1637-38. California State Land
   Commission Regulation: Article 3.4 ...................................................4

U.S. Const. amend. V.....................................................................*passim*

## STATEMENT OF ISSUES

1.      Did the District Court err in affirming the Bankruptcy Court's conclusion that the Commission's actions were a reasonable exercise of its police power and not a taking in violation of the Fifth Amendment of the U.S. Constitution or the Constitution of the State of California?  JA2577; JA2605.

2.      Did the District Court err in affirming the Bankruptcy Court's determination that the State properly exercised its police power by occupying property for the purpose of abating a hazard that posed a threat to human health, safety, and the environment?  JA25; JA2612-16; JA2672; JA2700-01; JA2706-08; JA846; JA1982; JA1625; JA2399-400; JA312-13; JA391-92; JA457.

3.      Did the District Court err in finding that the Commission's ability to compel ExxonMobil to operate the privately owned EOF is unsupported by the record, as is the Trustee's speculation that ExxonMobil might have reached a commercial arrangement with Venoco in time to avert an emergency?  JA20.

## STATEMENT OF RELATED CASES

This case has previously been before this Court in *Davis v. The State of California et al.*, Case No. 20-1061, involving issues not presented here.  That proceeding concerned Appellees' immunity defenses in the adversary proceeding. In Case No. 20-1061, this Court affirmed the District Court's judgment affirming the Bankruptcy Court's ruling, rejecting Appellees' immunity defenses.  *See Davis*

*v. California (In re Venoco, LLC)*, 998 F.3d 94, 110 (3d Cir. 2021).  The Supreme Court subsequently denied the Commission's petition for a writ of certiorari.  *Cal. State Lands Comm'n v. Davis,* 142 S. Ct. 231 (2021).  Related pending proceedings in other courts include:

1.     *Eugene Davis et al. v. Plains Pipeline LP et al.,* Case No. 16-CV-01319, in the Superior Court of California, County of Santa Barbara.

2.     *In re Venoco, LLC,* No. 17-10828 (Bankr. D. Del.) (underlying bankruptcy case).

# INTRODUCTION

When Venoco LLC ("Venoco") filed bankruptcy and walked away from its obligations to clean up 32 related undersea oil and gas wells (the "Wells"), the State of California (the "State"), acting through the California State Lands Commission (the "Commission"), had no choice but to step into Venoco's shoes and take over operation of sensitive equipment necessary to prevent the uncontrolled emission of toxic gas. The Wells were left by Venoco in a production-ready status, unplugged and generating gas, and together with the Ellwood Onshore Facility ("EOF") created an imminent risk to public health, safety and the environment. The Commission undertook plug and abandonment ("P & A") activities necessary to prevent the release of oil and toxic gas, and concomitant risk to public health, safety, and the environment. From 2017 until 2023, at which time the P & A activities were completed and the Commission left the EOF, the Commission spent over $25 million at the EOF alone in operating equipment and maintaining the site, costs that would otherwise fall to Venoco and the Trust.

Eugene Davis, in his capacity as Liquidating Trustee (the "Trustee") of the Venoco Liquidating Trust (the "Trust") remarkably complains about the Trust's inability to use the EOF, which use would have been unlawful in any event. Even more remarkably, the Trustee sought damages from the Commission of

$161,000,000 because of the Commission's presence on the EOF, which was in order to remedy conditions presenting palpable risks to the community.

Both the Bankruptcy Court and the District Court rightly rejected the Trustee's demand for compensation, holding that the Commission's actions were a classic exercise of the State's police power necessary to address an imminent risk to health, safety, and the environment. The Trustee's Brief to this Court provide no basis for rejecting this well-reasoned determination.

## FACTUAL BACKGROUND

A.  **Appellees Are Public Agencies Tasked with Protecting the Public and Preventing Injuries to Human Health, Safety, and the Environment.**

The State of California and the California State Lands Commission are public entities. JA29. The Commission is a land resource management agency that acts on behalf of the State to manage over four million acres of public lands both onshore and offshore. JA29; JA1583-84. It is tasked with preventing injury to the resources and the lands underlying the submerged waters within its jurisdiction, as set forth in the California Public Resources Code. JA1637-38. California State Land Commission Regulation: Article 3.4, Oil and Gas Drilling and Production Operations: Pollution Control - 2 Cal. Code Regs. ("CCR") § 2135.

**B.  The EOF Is, and Has Always Been, Inextricably Interconnected to Platform Holly and Necessary for Treating Toxic Gas Emanating from the Offshore Wells.**

The State owns an offshore oil and gas field located in State waters off the coast of Santa Barbara, California.  JA29; JA504-05.  This field (the "South Ellwood Field" or "Field") consists of 32 offshore Wells and an offshore platform ("Platform Holly") used to conduct operations in the Field.  JA29; JA504-05.

In 1964, the State, acting by and through the Commission, entered into certain oil and gas leases (the "Leases") with Richfield Oil Corporation and Socony Mobil Oil Company, the predecessors in interest to ExxonMobil Corporation ("ExxonMobil"), giving ExxonMobil rights to drill for, produce, and take oil and gas from the Field.  JA1589-99; JA504-05.  In 1997, the Commission approved the transfer of the Leases from ExxonMobil to Venoco.  JA29-30.  The Leases, as amended, gave Venoco the exclusive right to conduct operations at the Field in exchange for rent and royalties paid to the State.  JA29-30.

At the same time that Venoco acquired the Leases, it also acquired from ExxonMobil the property that is at the heart of this dispute, the Ellwood Onshore Facility (the "EOF").  JA505; JA88.  Since the Effective Date of Venoco's confirmed chapter 11 plan – October 1, 2018 –  title to the EOF has been held by the Venoco Liquidating Trust.  JA505; JA2197.  The EOF is an onshore oil and gas processing facility integrated with Platform Holly.  JA30.

The EOF sits on a 4.46-acre coastal site in Goleta, California, between a resort and a golf course, and near residential communities, an elementary school, and open space areas, including a public beach. JA1715; JA1722. Although it operated as an oil and gas processing facility since the mid-1970s, throughout that time it was zoned by the City of Goleta as "REC (Recreation), Open Space / Active Recreation (General Plan)" and is not zoned for any other use, including for residential or commercial use. JA506. The EOF's use as an oil and gas processing facility was grandfathered in as a legal "non-conforming use." JA505-06.

During the time that it operated as an oil and gas processing facility, the EOF was equipped with processing equipment, utilities systems, electrical gear, storage tanks, custody transfer units, a building that houses switchgear, a control room, laboratory, offices, and thousands of feet of interconnecting pipes. JA505. The EOF also had a Title V air permit[1] ("Air Permit") issued by the Santa Barbara County Air Pollution Control District ("SBCAPCD"). JA1107. Without the Air Permit, the EOF processing equipment cannot be lawfully operated. JA1174-75; JA1511; JA1625.

The EOF is physically connected and integrated to Platform Holly via pipelines through which oil and gas is transported from Platform Holly to the EOF,

_____

[1] Title V refers to Title V of the Clean Air Act, 42 U.S.C. § 7661 *et seq*.

and by undersea power and communications lines that supply electricity, communications, and monitoring connectivity to the Platform, and by a return gas supply line used in emergency circumstances. JA31; JA88; JA506. Platform Holly has never been connected to any facility other than the EOF, nor has it ever had any means of transporting oil or gas other than to Platform Holly. JA507; JA2456. By the same token, the EOF has never served any facility other than Platform Holly. JA507.

Platform Holly has always relied on the EOF to safely process the potentially lethal hydrogen sulfide gas ("$H_2S$") that emanates from the annular casings of the Wells. JA507; JA2456. Platform Holly itself does not contain the equipment – or even the space for such equipment – to treat the $H_2S$ gas that comes from the Wells. JA1686-87; JA2456. The $H_2S$ gas necessarily flowed through the platform to the onshore facility because the equipment required to process $H_2S$ is all located at the EOF. JA506; JA1108-09; JA1127-28; JA2456. Simply letting the $H_2S$ sit unprocessed in the interconnected pipes between the Wells and the Platform and the equipment on the EOF was not an option, as doing so would create a risk of equipment failure and release of $H_2S$ that could result in "contamination to the surrounding environment and wildlife." JA56-57.

$H_2S$ is a toxic gas that is odorless at poisonous concentrations, and that even at low levels can have serious adverse effects on human health. JA1283; JA1296-

97; JA1726-27; JA1957. H2S produces a visible cloud, but smell cannot be relied on to detect it. JA1283; JA1296-97; JA1726-27; JA1957. There is no significant warning to the human body in the presence of H2S. JA1283; JA1296-97; JA1726-27; JA1957.

To prevent the H2S from accumulating to dangerous levels and threatening the health and safety of the nearby public, as well as the environment, "the H2S that originated from the Wells is continually pumped off to the EOF where it is effectively neutralized." JA1127-28; JA56. At the EOF, the H2S was sent through an iron sponge tower, where it reacted with iron chips to create harmless iron sulfide, then burned off safely in a flare at the EOF. JA1127-28; JA1958-59; JA1966-67. This procedure was required by the Air Permit and Santa Barbara County Air Pollution Control District Rule 310, which prohibits the discharge of odorous organic sulfides. JA1127; JA1958-59; JA1966-67. The EOF is equipped with 29 detectors within the facility and 6 more on the exterior fence line of the facility, that will notify personnel in the event of a release of H2S. JA1075-76; JA1083.

Because the release of even small amounts of H2S into the air can quickly pose a fatal risk, both Platform Holly and the EOF were (until plugging was completed in 2023) monitored 24 hours a day by trained personnel, and all personnel and visitors were required to wear personal protective equipment in

certain locations. JA1666; JA1788; JA1075; JA1082-83; JA1541-42. The Wells would have continued to discharge $H_2S$ until the wellbores were permanently sealed with concrete and reinforced (a process undertaken by the Commission after Venoco's failure to do so, and referred to as "plugging and abandoning" or "P & A"). JA1678-79.

The Bankruptcy Court found that "the EOF was and is the only way to ensure that $H_2S$ gas did not build up to dangerous levels and pose a risk to human life." JA58.

### C. Venoco Walked Away from Its Obligations to Maintain the EOF and Safely Treat $H_2S$.

In May 2015, the Plains Pipeline, which was the sole means by which Venoco transported oil and gas from the EOF to market, ruptured. JA32. After the 2015 rupture, commercial production of oil and gas ceased. JA506. After filing a first bankruptcy in March 2016 and emerging from that bankruptcy, Venoco again found itself in financial distress by late March, 2017. JA33. On March 31, 2017, Venoco's legal counsel notified the Commission that Venoco was considering quitclaiming its Leases, and outlined the scenarios under consideration. JA59; JA2459. This was followed on April 12, 2017 by a more dire and pointed email from Venoco's Chief Operating Officer to the Executive Officer of the Commission, stating that Venoco "will soon be unable to continue meeting its obligations under the [Leases]" and that it was awaiting a board decision whether

to quitclaim the Leases "in the near future." JA2054; JA2460. The email asserted that Venoco intended to work with the Commission to facilitate a "safe and responsible transition" of the Leases, which included "continued operational support from EOF recognizing that it is operationally necessary for the plugging and abandonment of the [Field]." JA2054; JA2460.

The April 12 email concluded that Venoco would be "willing to maintain current operations for a short transition period beyond April 30, 2017, provided that an acceptable reimbursement agreement can be finalized in the near future . . . . " JA2460. Prior to this email, the Commission had been unaware that Venoco was imposing a deadline on negotiations and that it intended to abandon the EOF in less than three weeks if no agreement was reached. JA2461. The Commission thus turned its attention to obtaining emergency funding to pay Venoco's staff to continue operating the EOF to safely treat the $H_2S$ emanating from the Wells, and began searching for contractors qualified to take over EOF operations. JA2461; JA1660-61. On April 17, 2017, Venoco quitclaimed the Leases (JA9; JA81-82; JA89) and the Commission acknowledged receipt of the quitclaim and reminded Venoco of its legal obligation to plug and abandon the Wells. JA2463. On the same day, Venoco filed for bankruptcy for a second time. JA2463.

Given the abrupt notice and the sudden emergency presented by Venoco's evasion of its legal obligations, the Commission had to seek emergency funding on an expedited basis. JA2461; JA1660-61. Following its receipt of the April 12 email, the Commission worked with the California Governor's Office, the California Department of Finance, and others to obtain funding to enter into an agreement with Venoco that would ensure that necessary personnel would remain on site and safely operate the EOF and Platform Holly – most importantly, in order to treat the dangerous $H_2S$ gas, a task requiring around the clock, on-site supervision. JA1661-62; JA1672. It is uncontroverted that the EOF and Platform Holly were "able to operate safely for decades in spite of the presence of high levels of $H_2S$ because of the constant monitoring and maintenance of the facilities by skilled personnel." JA2482. Indeed, "the Commission learned when it assumed operation of the facilities after the Quitclaim that the Wells were in such poor condition that leaving the facilities unmanned would not have been a rational option." JA2482. With such imminent hazards presented, doing nothing in response to Venoco's actions "was out of the question." JA2482-83.

Presented with these unanticipated emergency conditions, the Commission quickly submitted an "Unanticipated Cost Funding Request" (the "Funding Request") to the California Department of Finance, seeking $3 million by May 1, 2017, so that the Commission could maintain adequate staffing at the EOF.

JA1661; JA1662; JA1672.  Thereafter, the Commission entered into an Agreement for Reimbursement of Temporary Services (the "TSA" or "Reimbursement Agreement") with Venoco.  JA507; JA831; JA1007; JA2063-64.  The TSA provided that Venoco personnel would continue operating the EOF and Platform, with the cost reimbursed by the Commission.  JA508.  The TSA was intended to operate until September 15, 2017.  JA508.

On September 1, 2017, the Commission contracted with a new company formed by former Venoco executives – Beacon West –  to take over operation of the EOF and Platform Holly, and to perform related work.  JA508; JA1610-11.  On September 14, 2017, the Commission and Venoco entered into a letter agreement regarding the Commission's (and its contractor, Beacon West's) continued use of the EOF while the parties continued negotiations of various unresolved issues (the "Gap Agreement").  JA1008-09; JA2109-12.

The Gap Agreement was amended four times.  JA509.  Under the fourth amendment, the Commission agreed to pay Venoco during its term, beginning in March 2018, a monthly payment of $100,000 for use of the EOF, which would be credited toward a "catch-up payment" if the parties eventually reached resolution of unresolved issues.  JA1617; JA2117-18.  The Commission made all payments required under the Gap Agreement.  JA1040; JA1618-19; JA1622.

On May 23, 2018, Venoco's chapter 11 plan was confirmed.  JA10.  In August 2018, Venoco notified the Commission of its intention to terminate, effective October 15, 2018, the agreement under which the Commission had been operating the EOF.  JA2349-50.  The chapter 11 plan became effective on October 1, 2018.  On the same date,  the Trust was formed, and title to the EOF was transferred to it.  JA10.  When, as Venoco informed the Commission, the Gap Agreement terminated on October 15, 2018, the Commission continued to use and occupy the EOF, asserting its right to use the EOF without payment by virtue of its police power in response to the ongoing conditions on the EOF.  JA1010.  Nevertheless, the Commission continued to pay all operating and ownership costs of the EOF, including insurance, taxes, and maintenance costs, as well the costs of personnel that were monitoring the facility.  JA1010-12; JA1167-68.  Through December 31, 2021,[2] the Commission spent more than $25 million to manage and operate the EOF, at a burn rate of approximately $500,000 per month.  JA1168-69; JA1701-02; JA2639.

---

[2] December 21, 2021 was the end of the last quarter before trial commenced on March 7, 2022.

**D. The Commission Contracted with ExxonMobil to Assist with Plugging and Abandoning the Wells Because Venoco Walked Away from Its Obligation to Do So.**

When the Commission approved the assignment of the Leases from ExxonMobil to Venoco in 1997, the Commission did not release ExxonMobil from its obligations under the Leases. JA1629-32 (Commission's Executive Officer trial testimony that it was the Commission's position that ExxonMobil had the responsibility to plug and abandon the Wells if Venoco could not). Following Venoco's quitclaim, the Commission entered into a settlement with ExxonMobil called the Phase I Agreement, pursuant to which ExxonMobil agreed to assist with plugging and abandoning the Wells. JA131-61

The Phase I Agreement describes the purpose of the settlement between the Commission and ExxonMobil as follows: "Given Venoco's inability to fulfill its lease, regulatory and statutory obligations to properly plug and abandon its wells and to decommission all associated infrastructure or to comply with DOGGR Order 1116 (JA39-40), the Parties have voluntarily engaged in a cooperative agreement, contained herein, to facilitate the timely plugging and abandonment of the thirty-two (32) Wells listed below." JA136. The Trustee did not call a witness at trial to testify about the Phase 1 Agreement or his theories regarding ExxonMobil. Nonetheless, the Phase 1 Agreement itself reflects that it settled a disagreement regarding the scope of ExxonMobil's obligations, reciting that

"ExxonMobil contends that Mobil was not the previous operator of a portion of seven (7) of the thirty-two (32) Wells (the "Contested Wells") which ExxonMobil contends were drilled and permitted after Venoco became the lessee under the Leases" while "[the Commission] contends that Mobil, as the predecessor lessee to Venoco, was the previous operator of all thirty-two Wells". JA131-61 (Phase 1 Agreement), ¶¶ D and E.

The Phase I Agreement expressly excluded the maintenance and operation of the EOF from its scope. JA131-61. Specifically, the Phase I Agreement states:

> 1. <u>Matters Outside Scope of This Phase I Agreement.</u>
>
> This Phase I Agreement shall not cover any of the following:
>
> (i)  The manning, servicing, operation and maintenance in a safe and secure condition of the EOF, including the operating systems and safety equipment at the EOF.
>
> (ii)  The Decommissioning of the EOF, as may be required under any applicable Laws and Regulations, or agreements.

JA141.

The Bankruptcy Court gave consideration to the limited evidence concerning ExxonMobil's P & A obligations that was presented at trial. JA39-40.

**E.  The Bankruptcy Court Held that the Commission's Use of the EOF Was a Valid Exercise of Its Police Powers in Response to an Emergency.**

The Bankruptcy Court conducted a five-day bench trial from March 7, 2022 through March 11, 2022. JA28-78. The Bankruptcy Court concluded, in a 51-

page opinion containing more than 120 detailed footnotes citing extensively evidence in the record, that the Commission's use of the EOF was a valid exercise of the State's police power in response to the emergency conditions on the EOF and the risk posed by the presence of $H_2S$. The Bankruptcy Court concluded that the Commission's "action taken to manage a potentially hazardous situation on private property that is not being sufficiently managed by the property owner – is an exemplary illustration of its police power." JA62.

### F. The District Court Affirmed the Bankruptcy Court's Judgment.

The Trustee appealed the Bankruptcy Court's ruling to the District Court, which affirmed the Bankruptcy Court's judgment. JA2446. The District Court agreed with the Bankruptcy Court that the Commission's actions were needed to "avert peril." JA24. The District Court found – as had the Bankruptcy Court – that the Commission's alleged ability "to compel ExxonMobil to operate the privately owned EOF is unsupported by the record, as is the Trustee's speculation that ExxonMobil might have reached a commercial arrangement with Venoco in time to avert an emergency." JA24.

## STANDARD OF REVIEW

Because in bankruptcy cases the district court sits as an appellate court, this Court's review of the District Court's decision is plenary. *Brown v. Pa. State Emps. Credit Union,* 851 F.2d 81, 84 (3d Cir. 1988) (citation omitted).

This Court reviews the District Court's legal determinations *de novo*. *In re Pursuit Cap. Mgmt., LLC*, 874 F.3d 124, 133 n.14 (3d Cir. 2017). The Bankruptcy Court's findings of fact are adopted unless found to be clearly erroneous. *Id*.; *City of Jersey City v. 108 Storms JC, LLC (In re Jersey City Cmty. Hous. Corp.),* 1 WL 1254833, at *3, n.4 (3d Cir. 2024).

"Whether a taking compensable under the Fifth Amendment has occurred is a question of law based on factual underpinnings." *Alves v. United States*, 133 F.3d 1454, 1456 (Fed. Cir. 1998) (citation omitted). Thus, this Court reviews the Bankruptcy Court's legal analysis and conclusions *de novo* and its fact-findings for clear error. *Bass Enters. Prod. Co. v. United States,* 133 F.3d 893, 895 (Fed. Cir. 1998).

This Court reviews a district court's determination whether a party waived an argument by failing to raise it earlier in the proceedings for abuse of discretion. *See Seed Co. v. Westerman, Hattori, Daniels & Adrian, LLP*, 961 F.3d 1190, 1195 (D.C. Cir. 2020) ("We conclude that the appropriate standard of review [of the district court's determination that a party waived a substantive claim] is for abuse of discretion.") (reh'g den 2020 U.S. App. LEXIS 24032 *).

## SUMMARY OF ARGUMENT

It is a foundational principle of American law that "all property in this country is held under the implied obligation that the owner's use of it shall not be

injurious to the community." *Keystone Bituminous Coal Ass'n. v. DeBenedictis*, 480 U.S. 470, 491-92 (1987) (quoting *Mugler v. Kansas*, 123 U.S. 623, 665 (1887)). The law of public and private nuisance has its origins in this principle. The right of government, through the exercise of the police power, to prohibit or regulate uses of property that are injurious to the health and safety of the community similarly has its origins in this principle. As a result, when government comes onto private property to remedy a risk to human health, safety, or the environment, government is not engaged in a taking of property for public use. This is the case not only because the government is not coming onto private property to engage in a public use of the property, but also because the government is not taking property from the owner, since the owner has no property right to engage in the injurious activity to begin with. *Mugler*, 123 U.S. at 665.

The Trustee asserts that such police powers exists only in an "emergency," and that such "emergency must be an 'unforeseen' circumstance calling for immediate action, and the circumstances must pose an "imminent" threat of impending peril." Tr. Br. at 18. The police power exception to the Takings Clauses of the United States and California Constitutions is not so limited, but also encompasses exercises of the police power intended to remedy activities on real property that present risks to human health, safety, or the environment.

As found by the Bankruptcy Court, the evidence at trial established that the oil and gas emanating from the South Ellwood Field Wells contain particularly high levels of toxic $H_2S$ gas, which if released would present an immediate danger to human life, health, and the environment. The facts further established the need for the EOF to be safely operated and maintained until the Wells are plugged and abandoned in order to prevent the potentially lethal release of untreated $H_2S$ to the surrounding areas and that the Commission had more than ample reason to exercise its police power based on the belief that the Trustee would either be unwilling or unable to continue operating and maintaining the EOF.

Additionally and independently, the Commission's entry upon, and continued presence on, the EOF was undertaken in response to "emergency conditions," since the Commission's actions were "under the pressure of public necessity" and to avert peril. *Holtz v. Superior Court*, 475 P.2d 441, 446 (Cal. 1970) (quoting *House v. L.A. County Flood Control Dist.,* 153 P.2d 950 (Cal. 1944)).

Second, the Trustee presented no valid case why ExxonMobil's supposed obligations to clean up and plug the Wells would have extended to a legal obligation to occupy and operate the EOF. The Trustee's ExxonMobil argument amounts to an attempt to second-guess the Commission's method of securing the public health, safety, and welfare and flies in the face of specific factual findings

by the Bankruptcy Court that there were no feasible alternatives to the Commission's operation of the EOF.

Third, the Trustee argues that "the district court's judgment improperly permits the State to take unoffending private property as a tool to remedy a hazard at the State's own property." Tr. Br. at 20. The District Court correctly held that this argument had not been raised before the Bankruptcy Court, and thus waived, and had been further waived before the District Court because it was raised belatedly in the Trustee's reply brief. JA25, n.10. On the merits, there is extensive legal authority upholding the principle that, so long as entry onto property was necessary to avert peril to the community, the question of compensability does not turn on whether the peril originated on the property. In any event, the EOF is not "unoffending property," since the undisputed facts demonstrate that the risk of $H_2S$ emissions was a risk at the EOF itself and that both the risk to the public and environmental regulations required that $H_2S$ be treated at the EOF.

# ARGUMENT

I. **THE BANKRUPTCY COURT AND THE DISTRICT COURT CORRECTLY HELD THAT THE COMMISSION'S ACTIONS TAKEN FOR THE PROTECTION OF THE PUBLIC DO NOT GIVE RISE TO A COMPENSABLE TAKING UNDER THE TAKINGS CLAUSES OF THE UNITED STATES AND CALIFORNIA CONSTITUTIONS.**

   A. **Longstanding Precedent Recognizes That No Compensable Taking Arises From the Exercise of the Police Power Taken to Protect Against Risks to the Public Health, Safety and Environment.**

      1. There Was No Compensable Taking Arising Under the Takings Clause of the Fifth Amendment to the United States Constitution.

The Takings Clause of the Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. Appellees successfully argued before both the District Court and Bankruptcy Court that deeply rooted Supreme Court precedent, beginning at least with *Mugler v. Kansas,* established the rule that "where the State acts to preserve the 'safety of the public' the State 'is not, and consistent with the existence and safety of organized society, cannot be burdened with the condition that the society must compensate such individual owners for pecuniary losses they may sustain . . . '" JA47 (quoting *Mugler,* 123 U.S. at 668-69). This rule, in turn, has its basis in the "recogni[tion] that 'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community' . . . and the Takings Clause did not transform that

principle to one that requires compensation whenever the State asserts its power to enforce it." *Keystone Bituminous Coal Ass'n,* 480 U.S. at 491-92 (quoting *Mugler*, 123 U.S. at 664, 665). Even more fundamentally, the State's exercise of the police power rests upon "the fundamental principle that everyone shall so use his own [property] as not to wrong and injure another . . . ." *Fertilizing Co. v. Hyde Park*, 97 U.S. 659, 667 (1878).

This rule recognizes a distinction between the state's exercise of eminent domain to acquire private property for public use and its exercise of the police power to prevent injury to the public. Thus, in widely different contexts, the Supreme Court since *Mugler* has held that the government's exercise of its police power for the protection of the public does not give rise to a taking under the Fifth Amendment. *Keystone Bituminous Coal Ass'n.*, 480 U.S. at 491-92, 512 (citing *Mugler*, 123 U.S. at 664.) (no taking of property where the government prohibits mining of coal from portions of land because of the risk of subsidence damage); *Nat'l. Bd. of Y.M.C.A. v. United States*, 395 U.S. 85 (1969) (no liability for damage caused by rioters to buildings occupied by troops acting primarily in defense of buildings); *Goldblatt v. Hempstead*, 369 U.S. 590, 594 (1962) (quoting *Mugler*) (the "exercise of the town's police power" to prohibit excavation on property as a safety measure, preventing all productive use of the property, did not confiscate property without compensation); *Miller v. Schoene*, 276 U.S. 272, 280 (1928)

(citing *Mugler*, 123 U.S. 623) (permitting cutting cedar trees because of the threat presented of spreading disease to apple orchards); *see also Chi., B. & Q.R. Co. v. Illinois*, 200 U.S. 561, 593-94 (1906) ("[T]he clause prohibiting the taking of private property without compensation is not intended as a limitation of the exercise of the police powers which are necessary to the tranquility of every well-ordered community, nor of that general power over private property which is necessary for the orderly existence of government.") (internal citations and quotations omitted).

The Supreme Court's recent decision in *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021), a case relied upon by the Trustee, is not contrary to the above-cited cases.  In that case, the Supreme Court recognized that "many government-authorized physical invasions will not amount to takings because they are consistent with longstanding background restrictions on property rights." *Id*. at 2079.  Quoting *Cedar Point Nursery*, the Bankruptcy Court stated as follows:

> These background limitations [ ] encompass traditional common law privileges to access private property. One such privilege allowed individuals to enter property in the event of public or private necessity. See Restatement (Second of Torts § 196 (1964) (entry to avert an imminent public disaster); § 197 (entry to avert serious harm to a person, land or chattels [ ].

JA52 (quoting *Cedar Point Nursery*, 141 S. Ct. at 2079).

Similarly, numerous lower federal court cases have upheld the distinction under the Fifth Amendment between exercises of the police power, which do not constitute a taking, and exercises of the power of eminent domain, which do. "The distinction between an exercise of the police power and a constitutional taking has been characterized since *Mugler* as 'whether the government action operates to secure a benefit for or prevent a harm to the public.'" *Craig Patty & Craig Thomas Expeditors, LLC. v. United States,* 136 Fed. Cl. 211, 214 (Fed. Cl. 2018) ("*Patty*") (quoting *Morton Thiokol, Inc. v. United States*, 4 Cl. Ct. 625, 630 (Cl. Ct. 1984)). The Bankruptcy Court quotes the Tenth Circuit in drawing this distinction, stating that the "[p]olice power should not be confused with eminent domain, in that the former controls the use of property . . . for public good, authorizing its regulation and destruction without compensation, whereas the latter takes property for public use and compensation is given for property taken, damaged and destroyed." JA53 (quoting *Lamn v. Volpe*, 449 F.2d 1202, 1203 (10th Cir. 1971)).

The Trustee argues that the Commission "took the EOF to complete the plugging and abandoning of its offshore wells" which it asserts is a "public use." Tr. Br. at 43. This effort to conflate the emergency to which the Commission was responding with public works is incorrect as a matter of fact and law. First, as the Bankruptcy Court found, "in assuming operations of the EOF, the Commission was acting to avert harm to both the public and the environment." JA13. While

the Bankruptcy Court found that the peril to which the Commission was responding (*i.e.,* the threat of a toxic release of $H_2S$ that was averted by use of the EOF) would continue until the plugging and abandonment of the Wells was completed (JA9; JA32), nowhere does it find that the EOF was operated by the Commission for the purpose of completing the plugging and abandonment of the Wells. Rather, the Bankruptcy Court found that the use was necessary to protect the public from a serious threat of harm. Moreover, neither the operation of the EOF to avert a public peril, nor the performance by the Commission of Venoco's plugging and abandonment obligations at the Wells, was a "public use," as that term is used in applicable takings law. *See* pp. 22-24, *supra* (discussion regarding distinction between a state's exercise of eminent domain to acquire private property for public use and its exercise of the police power to prevent injury to the public).

The Court also should reject the Trustee's effort to equate the Commission's use of the EOF (which was undertaken to avert a peril to the public occasioned by Venoco's own actions), with the situation in *Patty*, where the Federal Court of Claims found that plaintiffs had stated a claim under the Takings Clause where the Drug Enforcement Agency seized plaintiff's truck not to prevent a harm, but because it was convenient to use in a drug sting operation. In considering the DEA's assertion that its use of the truck was an exercise of police powers, the

court recognized the operative test to be "whether the governmental action operates to secure a benefit for or to prevent a harm to the public." *Patty*, 136 Fed. Cl. at 214 (citations omitted). Under the facts of that case as plead by the plaintiff, the court observed that the DEA had chosen to use the truck "as a tool" to secure a benefit for the public. *Id*. at 214-15. From that observation, the Trustee invites the Court to adopt a new "used as a tool" legal theory, under which the Court would examine not whether governmental action operated to secure a benefit for the public as opposed to preventing a harm to the public, but instead simply whether private property was somehow "used as a tool." *Patty* itself does not stand for that proposition, nor have Appellees found any case that has cited *Patty* for that proposition. Rather, in *Patty*, the Court recognized the test from *Mugler* as cited above, and found as a factual matter that the DEA had appropriated the truck as a matter of convenience, not necessity.

Appellees do not contend, and the District Court and Bankruptcy Court did not hold, that any invocation of the police power permits a non-compensable entry onto, or taking of, private property. This is especially true given the widely differing meanings given over the years to the "police power," some so broad as to encompass virtually any lawful exercise of governmental regulatory power. *See, e.g.*, *Hoke v. United States*, 227 U.S. 308, 322-23 (1913); *Gloucester Ferry Co. v. Pennsylvania*, 114 U.S. 196, 216-17 (1885). Instead, Appellees have contended

throughout this proceeding that precedent supports at least the narrower principle that the Takings Clause does not require compensation where entry onto property is required to avert or abate risk to public health, safety, and the environment.

Institute for Justice ("IJ"), *amicus curiae*, takes a more extreme position than the Trustee. Limiting itself to the Federal Constitution's Takings Clause, IJ contends, "[t]hat *no* emergency can justify taking private property without paying for it." IJ Br. at 3 (emphasis in original). Thereafter, IJ tempers its position slightly, arguing that Supreme Court precedent "[r]ejects a categorical police power exception to the Fifth Amendment." *Id*. at 4; *see also id*. at 6, 7, 19-20. Appellees have never argued for a categorical police power exception to just compensation, just for an exception where the police power is exercised to prevent clear risks of harm to the community.

IJ recognizes, as it must, the numerous cases in which the Supreme Court and the Courts of Appeals (including this Court) have rejected claims of just compensation arising in cases out of exercises of the police power. IJ Br. at 5-8 & n.2. IJ contends that these exceptions to compensation can be explained by "some 'background principle' of property law." IJ Br. at 6; *id*. at 16-20. State property law cannot, of course, explain the innumerable federal cases that find no compensation and make no mention of state law property principles. For example, Appellees have found no Superfund case where the uncompensated entry onto

property was made contingent upon a state property law exception. This Court need not delve into the abstruse arguments presented by IJ, since under either federal case law or California state property law, the Commission's actions here were not a compensable taking.

### 2. There Was No Compensable Taking Arising Under the Takings Clause of the California Constitution.

The Takings Clause of the California Constitution, in principal part, provides as follows: "Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." Cal. Const. art. I, § 19(a). The California case law applying this Clause closely mirrors the case law applying the Fifth Amendment, and the Bankruptcy Court correctly concluded "that there is no material difference between the two as they apply to this case, and . . . the Commission's actions here constitute a valid exercise of the police power under either one." JA49.

Perhaps the best-known explanation of the distinction drawn under California takings law between damage to real property caused by public works, for which compensation is required, and damage caused by an exercise of the State's police power, for which compensation is not required, is contained in *Customer Co. v. City of Sacramento,* 895 P.2d 900 (Cal. 1995). In that case, the California Supreme Court held that a plaintiff failed to state an inverse

condemnation claim under California's Taking Clause and explained the basis for

its holding as follows:

> As is demonstrated by both the history and the consistent judicial interpretation of section 19, that provision never was intended, and never has been interpreted, to impose a constitutional obligation upon the government to pay "just compensation" whenever a governmental employee commits an act that causes loss of private property . . . . Neither the "taken" nor the "or damaged" language ever has been extended to apply outside the realm of eminent domain or public works to impose a Constitution-based liability, *unamenable to legislative regulation*, for property damage incidentally caused by the actions of public employees in the pursuit of their public duties.

*Id*. at 906 (emphasis in original).

The holding of *Customer Company* was reiterated more recently by the

California Supreme Court in *Property Reserve, Inc. v. Superior Court*, 375 P.3d

887 (Cal. 2016), as follows:

> [N]umerous statutes grant public entities and employees the authority to enter and to engage in official activities on private property for a very wide range of purposes. Common examples include entries to execute search warrants, to conduct health and safety inspections, to enforce fish and game regulations, to carry out workplace inspections, and to investigate and eliminate nuisances . . . As a general matter, in the absence of any connection with the construction or operation of a public improvement, conducting such entries and activities on private property, even when such activities result in damage to the property, has not been considered to constitute either the taking of a compensable property interest in property or the damaging of property so as to entitle the property owner to just compensation under the state takings clause.

*Id*. at 910 (citing *Customer Co.*, 895 P. 2d 900).

3.    <u>Extensive Additional Authority Supports the Conclusion that
      There Is No Compensable Taking in the Circumstances of this
      Case.</u>

The rule that an exercise of the police power to address risks of harm to the

community does not constitute a taking of property has similarly been the basis of

decision in numerous cases nationwide.  In a case whose facts closely parallel

those of this case, the Massachusetts Supreme Judicial Court in *Nassr v.

Commonwealth*, 477 N.E.2d 987 (Mass. 1985), rejected a takings claim brought by

the owner of a ten-acre parcel of property, on a portion of which governmental

authorities discovered large amounts of leaking hazardous chemicals and

contaminated property in structures posing risks to public health and safety.  Upon

discovery of these conditions, officials padlocked the affected area and occupied

the contaminated portion of plaintiff's land while the state conducted a cleanup of

the site.  In rejecting plaintiff's takings claim, the Massachusetts high court stated

as follows: "The Commonwealth's actions were classic exercises of the State's

police power to maintain the public health . . . The fact that the Commonwealth

temporarily occupied the portion of the plaintiffs land which was contaminated

while it conducted the cleanup procedures hardly transforms this exercise of police

power into an exercise of the eminent domain power."  *Id.* at 990-91.  The court, in

denying plaintiffs' claim for reasonable rental value, found the claim "sounds a

particularly hollow ring" since "[t]he warehouse was in no condition to be rented

until it was cleaned up." *Id*. at 991. *See also* JA62-63 (discussion of *Nassr* by

Bankruptcy Court).

Other states have similarly recognized that physical entry onto property to

remedy a risk to public health, safety, or the environment is not a taking. In *Aztec*

*Minerals Corp. v. Romer*, 940 P.2d 1025 (Colo. App. 1996), the government came

onto a site to operate facilities and subsequently contracted to remedy

environmental damage to the site and to eliminate the need for long treatment of

hazardous substances on the site. The court stated: "[W]e cannot conceive of any

set of facts in which the mere remediation of a contaminated site, even if it resulted

in physical damage to the property, could result in a taking[.]" *Id.* at 1032. In

*Starzenski v. City of Elkhart*, 659 N.E.2d 1132 (Ind. Ct. App. 1996) (cert den 519

U.S. 1028), after dealing for years with unsanitary and hazardous conditions on a

property, which the owner did not take steps to remedy, the city entered the

property and removed the offending conditions. The court reasoned: "The City

entered the Starzenski's property and removed trash and debris to abate a nuisance

under its police power. Such does not constitute a taking and the Starzenskis are

not entitled to compensation for the removed materials." *Id*. at 1140. *See also*

*Dekk Prop. Dev*., *LLC v. Wis. DOT*, 988 N.W.2d 653, 659 (Wis. 2023) ("Injuries

to property that result from a valid exercise of the state's police power are

generally not compensable."); *Phila. Redevelopment Auth. v. Atuahene*, 229 A.3d

1002, 1016 (Pa. Commw. Ct. 2020) ("In fact, this Court has concluded that the City 'has not 'taken' anything when it asserts its police power to abate a nuisance, and need not provide compensation when it destroys the value of property by abating the nuisance.'").

**B.     Precedent Does Not Limit the Exercise of the Police Power to Unforeseen and Imminent Risks of Injury to the Community.**

1.     "Emergencies" Do Not Represent the Only Permissible Basis for a Non-Compensatory Taking.

As shown above, there are a wide range of circumstances in which the government enters, or even takes possession of, private property in order to prevent risk of harm to the community that do not result in a compensatory taking. While many of these circumstances arise in "emergencies" – however defined – the Trustee is incorrect that emergencies represent the only permissible basis for a non-compensatory taking. At least so long as private property is "taken" in order to prevent risk to public health, safety, and the environment, no compensation is owed regardless of whether the circumstances giving rise to the governmental taking arise as a result of an "emergency." Both lower courts found the government action that occurred here was necessary to prevent risk to public health, safety, and the environment. *See, e.g.*, JA73 ("I am not, therefore, simply relying on the Commission's description of the situation as an emergency . . . .

Instead, I am relying on the facts at trial supporting the conclusion that the Commission was exercising its police powers.").

Nevertheless, as both the District Court and the Bankruptcy Court found, Appellees were faced with circumstances that did represent an emergency, in so doing rejecting the Trustee's unduly crabbed requirement of "imminent" and "unforeseen" emergencies.  JA21-23; JA64-73.

The Trustee relies in this Court largely, as it did in both the lower courts, upon California state cases for its contention that an emergency must be "imminent" and "unforeseen."  However, upon closer analysis, in none of those cases did a court actually apply the Trustee's proffered standard to *reject* the existence of an emergency.  Moreover, whatever may be the limits on what constitutes an emergency, "the so-called emergency exception to the just compensation requirement" is but "a specific application of the general rule that damage to, or even destruction of, property pursuant to a valid exercise of the police power often requires no compensation under the just compensation clause." *Customer Co*., 895 P.2d at 909.

> 2. The Bankruptcy Court Correctly Found that the Commission's Actions Were Taken to Avert Public Peril.

The Trustee draws support for his position from the "under pressure of public necessity and to avert impending peril" language appearing in *House v. L.A. Cnty. Flood Control Dist*., 153 P.2d 950, 953 (Cal. 1944).  This language is taken

from the following: "Unquestionably, under the pressure of public necessity and to avert impending peril, the legitimate exercise of the police power often works not only avoidable damage but destruction of property without calling for compensation." *Id.* The District Court correctly rejected the Trustee's reliance on *House* as follows: "[T]he Trustee spends the entirety of his 'emergency' argument on whether the State Defendants' actions addressed an 'impending peril.' In so doing, the Trustee ignores that the word 'avert' modifies 'impending peril' in the *House* decision. The record supports . . . [that] the Commission was acting to avert public peril." JA22.

The Commission's actions here were unequivocally taken to ***avert*** public peril. *See Merriam-Webster* ("avert" means "to keep from happening by taking action in advance"). Venoco notified the Commission that it would not continue operating the EOF, and as a result would not be able to monitor and treat the $H_2S$ at the EOF. JA60-62. The fact that the Commission worked cooperatively with Venoco for a period of time to avert the public peril does not obviate the continuing existence of a risk of impending peril. JA62.

*House*, like almost all the California cases cited by the Trustee, was a public works case, which this case is not. As construed by California's highest court, *see e.g., Customer Co. supra*, *Property Reserve*, *supra*, the State's Takings Clause draws a sharp distinction between damage to property proximately caused by the

construction and operation of public works, for which there is a heavy presumption compensation is owed, and damage incidental to the exercise of the police power unrelated to public works, for which compensation is generally not owed. Given the allegations in *House* that the alleged damages were the caused by the county's negligent planning and maintenance of public works, the availability of takings compensation followed almost as a matter of course. Perhaps most importantly, the county never argued that it faced an emergency and that the emergency exception to compensation was applicable. Therefore, not only was the Court's discussion of the emergency exception *dicta*, the facts of the case did not require setting forth a controlling standard for an emergency.

The Trustee's reliance on *Holtz v. Superior Ct*., 475 P.2d 441 (Cal. 1970) is similarly misplaced. *Holtz* is also a public works case not involving an emergency. *Holtz* involved a claim for damages to buildings caused by the withdrawal of lateral ground support during construction of the BART underground transportation system. The court held that the building owners were entitled to compensation under the California Takings Clause for any injury to real property proximately caused by a governmental improvement, even in circumstances in which a private party would not be liable. *Holtz* went on to state: "Defendants do not, and could not, properly contend that their excavation and construction activity in the instant case falls within the 'police power' exception . . . ." *Id*. at 446. In

any event, *Holtz* never states that emergency conditions must be imminent or unforeseen, as the Trustee contends.

All the remaining cases relied upon by the Trustee are lower court cases, and were decided before the California Supreme Court's decision in *Property Reserve*. 375 P.3d at 910. In *Los Osos Valley Associates v. City of San Luis Obispo*, 36 Cal. Rptr. 2d 758 (1994) (rev. den., 1995 Cal. LEXIS 2162 *), the City, facing a water shortage, sought to resolve the problem by pumping groundwater, causing the subsidence of plaintiff's property. As the Bankruptcy Court correctly concluded: "In rejecting the police powers defense to plaintiff's inverse condemnation claim, the Court [in *Los Osos*] found that the City's choices over a period of years were not suggestive of an emergency and were politically motivated rather than motivated by a need to protect public health and safety." JA67. The *Los Osos* Court found that there was a lack of evidence supporting anything akin to an emergency, and, therefore, nothing turned on whether an emergency needed to be imminent or unforeseen much less what would constitute an imminent or unforeseen emergency. *Id.*[3]

---

[3] Moreover, *Los Osos* makes no reference to either *Holtz* or *House*, but instead quotes an opinion that defines an emergency in the context of a labor management dispute. *Id*. at 764 (quoting *Sonoma County Organization etc. Employees v. County of Sonoma*, 1 Cal. Rptr. 2d 850 (1991)).

*Odello Bros. v. County of Monterey*, 73 Cal. Rptr. 2d 903 (1998) (rev den 1998 Cal. LEXIS 5381 *) and *Thousand Trails, Inc. v. California Reclamation Dist. No. 17*, 21 Cal. Rptr. 3d 196 (2004) were both cases involving the intentional flooding of property caused by cutting a levee and both turned on the special nature of public works devoted to the control of flooding. In *Odello Bros.*, there was no dispute that the County was actually faced with an emergency. Therefore, again, there was no need to determine the imminence or foreseeability of the emergency. Contrary to the implication in Trustee's brief, the issue in the case was not the existence of an emergency, but whether the emergency cutting was compensable where it was the result of a known design flaw in another public work. *Odello Bros.*, 73 Cal. Rptr. 2d at 908. In *Thousand Trails*, the court found the existence of an emergency and, thus, the absence of any liability. In so doing, the Court did not hold that the district could have no knowledge of levee instability for there to be an emergency, since the district did have such knowledge and an emergency was still found to exist. 21 Cal. Rptr. 3d at 205.

The final two California cases relied upon by the Trustee, as the Bankruptcy Court determined, "turned on the fact that the government action in question was not actually necessary to protect public health and safety." JA68. *See Smith v. Cnty. of L.A.*, 262 Cal. Rptr. 754 (1989) (rejecting argument that removal of debris was an emergency) (reh'g den 1989 Cal. App. LEXIS 1091); *Rose v. City of*

*Coalinga*, 236 Cal. Rptr. 124 (1987) (finding issue of fact as to whether demolition of plaintiff's building was necessary).

3.    The Bankruptcy Court Correctly Found that Government Action Does Not Have to Relate to "Imminent" and "Unforeseen" Events to be Non-Compensable.

The Trustee's references to federal case law in support of his proffered "unforeseen" and "imminent" requirements are, with one exception, to general propositions of takings law and do not mention either requirement. The exception is a trial court opinion in *In re Upstream Addicks & Barker (Tex.) Flood-Control Reservoirs*, 146 Fed. Cl. 219 (2019), another case involving the breaching of levees. In distinguishing that case from the present one, the Bankruptcy Court below stated as follows: "[I]n *Upsteam Addicks*, the government did much more than simply anticipate the conditions that allowed the plaintiffs' property to flood; they intentionally created them." JA71. The Bankruptcy Court went on to conclude as follows: "The distinction between the cases relied upon by the Trustee and this case are striking. In both *Odello* and *Upstream Addicks* the government was making choices between which of two landowners would bear the greater burden in the event of flooding . . . ." JA71. By contrast, as the Bankruptcy Court found, there was no "evidence that the Defendants were involved in the design or construction of the infrastructure" built by the lessees at the EOF. JA72.

In sum, analysis of applicable case law does not support the Trustee's contention that to be non-compensable government action must not *just* be taken to "avert public peril," but must also be taken in response to an "imminent" and "unforeseen" event.

4.       The District Court Correctly Found that the Existence of an Emergency is a Factual Determination Reviewed for Clear Error and Concluded that There Was No Clear Error.

Given the Trustee's misinterpretation of the applicable case law, there was no error in the District Court's conclusion that "[n]otwithstanding the Trustee's attempts to reframe this as an appeal of one of more erroneous legal determinations, the existence of an emergency is a factual determination reviewed for clear error." JA14. Even if the "imminent" and "unforeseen" elements for which the Trustee advocates were applicable, the Bankruptcy Court's factual findings unequivocally establish, based on the extensive record of a five-day trial, that the emergency to which the Commission was responding was both imminent and unforeseen. The Bankruptcy Court's opinion is replete with factual findings regarding the immediacy and seriousness of the threat posed by Venoco's decision to abandon its operation of the EOF. As the Bankruptcy Court found, "Venoco created an emergency when it threatened to leave unmanned a facility that required constant monitoring to ensure public safety." JA68. "Given the quick acting nature of the threat at hand, it would have been the height of negligence for the

Commission to not take Venoco's threats [to walk off the job] seriously and respond accordingly." JA65. "While the Commission was certainly aware that the Wells emitted $H_2S$ gas and that the EOF was used to process that gas, the string of events that occurred thereafter and ultimately ended with Venoco being unable to fulfil its obligations was simply not reasonably foreseeable." JA73. The Trustee does not challenge as clearly erroneous those or any other of the Bankruptcy Court's factual findings.

### C. The Evidence Demonstrates that the Commission's Entry Onto, and Continued Presence On, the EOF Was an Appropriate Exercise of the State's Police Power.

The Findings of Fact by the Bankruptcy Court establish that the Commission's entry onto the EOF, and its continued presence on the EOF until the plugging and abandonment of the Wells was completed, was an entirely appropriate exercise of the State's police power, intended to remedy a risk posed by the EOF to public health, safety, and the environment. The Trustee does not contend that any findings of fact were clearly erroneous, nor could he, since the Bankruptcy Court was meticulous in supporting its findings with extensive evidence in the record. *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 210 (3d Cir. 2006).

Because the release of $H_2S$ gas is so hazardous, the EOF and Platform Holly were staffed around the clock. "In fact, as even the Trustee admits, the facilities

have been able to operate safely for decades in spite of the presence of high levels of $H_2S$ because of the constant monitoring and maintenance of the facilities by skilled personnel." JA57 (emphasis in original). The Commission's production engineer and project coordinator testified that given the state of Wells at the time, "doing nothing in response to Venoco's termination of the Gap Agreement was out of the question." JA58. The Bankruptcy Court concluded, "that the uncontroverted evidence . . . demonstrated that the EOF was and is the only way to ensure that $H_2S$ gas did not build up to dangerous levels and pose a risk to human life," thereafter quoting testimony that "without a constant operation and maintenance and presence by qualified staff and personnel, we were facing a catastrophic emergency with wells that were repressurizing and could create an oil spill, and then also $H_2S$ gas that was constantly being produced . . . ." JA58.

On the basis of these and extensive other findings, the Bankruptcy Court concluded: "[T]he Commission's intent and purpose in taking over operation of the EOF was uncontroverted and establishes both that the Commission believed there was a real risk that Venoco would cease operating the EOF and that it was motivated only by a need to protect public health and safety." JA61-62.

The Trustee asserts that the State was never presented with an "emergency" at the EOF because "no threat – imminent or otherwise – existed after September 15, 2017, at which time the State had secured staffing for and access to the

EOF . . . . ”  Tr. Br. at 22; *see also id*. at 18 (“[N]o 'imminent' threat of impending

peril existed because, by that time [September 15, 2017] the State had access to

and staffing for the EOF . . . .”).  The only reason the Trustee can even make this

assertion is that there was no chance **the State** would put lives at risk by

abandoning the EOF.  However, the Court had overwhelming support for its

conclusion that **Venoco** would have abandoned the EOF, but for the Commission

stepping in.  JA59-61.  There is not a scintilla of evidence that at any point after the

Commission first stepped in to operate and maintain the EOF, the Trustee was

prepared to come back to operate or maintain the EOF or bear the expense of its

operation.

The Trustee also falsely states that “the need to plug and abandon the wells

was found by the Bankruptcy Court to be 'not necessary' and 'not essential'”.  Tr.

Br. at 22.  In fact, the Bankruptcy Court was making the point that it was the

Commission's very operation of the EOF that made it safe to pause plug and

abandonment work during the pandemic: “[The Trustee] notes that the plugging

and abandoning work was paused for nearly eighteen months during the pandemic.

But this supports the Commission's argument rather than refutes it.  While the

plugging and abandoning efforts were put on hold due to social distancing

mandates in effect during the pandemic, both Platform Holly and the EOF were

still continuously staffed for monitoring purposes.  Given that only essential

services were permitted to continue under the government orders issued during the pandemic, this fact further demonstrates that a disruption of EOF operations had the potential to be catastrophic." JA66.

The Trustee also contends that the Commission knew of, and anticipated, that Venoco might quitclaim its leases, and required Venoco to post a bond to secure Venoco's plug and abandonment obligations, thus, somehow negating the existence of an emergency. The short answer to this whole line of argument is that the government is constantly planning for risks to the community and is frequently required to do so by law. *See, e.g.,* 42 U.S.C. § 4605 (requiring the president to create "the national contingency plan for the removal of oil and hazardous substances," which includes "procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants."); Cal. Gov't Code § 8574.1 (requiring the creation of the California Oil Spill Contingency Plan). No case Appellees are aware of, and certainly none of the authorities cited by the Trustee, has held that advance planning for potential risks means that when those threats come to pass and imperil the public health and safety, the government's entry onto private property to respond to the perils become compensable takings.

The Trustee also contends that, because the Commission knew that plugging and abandoning would have required use of the EOF, the Commission "should have and could have negotiated for the use of the [EOF] in *exchange for payment*."

Tr. Br. at 28 (emphasis in original). Putting aside the fact that the Trustee presented no evidence at trial to support this argument, the Trustee's contention is circular, since the issue is whether payment for use of the EOF was required at all. Use of the eminent domain power was not required if entry onto the EOF was a non-compensable exercise of the police power. Even if the State had sought to exercise eminent domain, as suggested by the Trustee, it no doubt would have faced a buzz-saw of opposition from the Trustee before the Bankruptcy Court in order to increase his economic leverage.

## II. THE BANKRUPTCY COURT AND DISTRICT COURT CORRECTLY REJECTED THE EXXONMOBIL "POTEMPKIN VILLAGE," WHICH IN ANY EVENT WAS NEVER A "VIABLE" ALTERNATIVE TO THE COMMISSION'S USE OF THE EOF.

The Trustee asserts that the "State's right to order ExxonMobil to plug and abandon the wells and bear responsibility for the cost of plugging and abandoning . . . [invalidated] the State's exercise of police power," Tr. Br. at 32, and that it is reversible error for the District Court to fail to consider the so-called ExxonMobil alternative. But the ExxonMobil "alternative" was really no alternative at all. And in any event, the Commission had no power to require ExxonMobil to occupy and operate the EOF. Moreover, regardless of who occupied the EOF, if such occupation was a lawful exercise of the police power, the Trustee would still not be entitled to compensation. Therefore, the Trustee's "ExxonMobil alternative" is entirely illusory and provides no basis for reversal.

The only potentially relevant evidence in the record – the Phase 1 Agreement itself – reflects that it settled a disagreement with the Commission regarding the scope of ExxonMobil's obligations to plug and abandon the Wells. JA2676; *see also* JA135 (Phase 1 Agreement at ¶¶ D, E). Both the Bankruptcy Court and the District Court recognized that the Phase 1 Agreement was nothing more or less than a settlement. JA39-40 (Bankruptcy Court decision); JA10 (District Court decision).

The EOF is expressly excluded from the Phase 1 Agreement, *see* p. 15, *supra*, and the EOF was never owned by the State. The Trustee cites no legal or contractual basis under which the Commission could compel ExxonMobil to operate the EOF. The Trustee cites no legal or contractual right that ExxonMobil would have had to operate the EOF. The Trustee never deposed a witness from ExxonMobil, or sought documents from ExxonMobil, or called at trial any witness from ExxonMobil. The Trustee never asked any trial witness whether, if ExxonMobil had been ordered to plug and abandon the Wells, it would have taken over the operation of the EOF. The Trustee never called anyone from ExxonMobil at trial to ask whether it would have been willing to operate the privately owned EOF, under any circumstances. The Trustee never even attempted to explore through the witnesses he did call (including the Trustee himself) whether there was any likelihood that a commercial agreement could have been reached between the

Trustee and ExxonMobil for operation of the EOF. Indeed, the Trustee presented no evidence of any kind at trial establishing whether, or under what circumstances, ExxonMobil would have been able to operate the EOF or might have been compelled to operate the EOF. The Trustee's purported ExxonMobil "alternative", therefore, is entirely speculative and without evidentiary support – as a result of the Trustee's own strategic decision not to seek evidence from ExxonMobil.

The Trustee asserts that "[t]he State cannot offer more than speculation as to what ExxonMobil would have done or what would have happened if ExxonMobil was ordered to plug and abandon the wells because the State never issued such an order out of fear that litigation would result." Tr. Br. at 38. But this simply improperly attempts to reverse the burden. The Trustee, of course, bears the burden of proving his entitlement to just compensation as a plaintiff in an inverse condemnation proceeding.

The Trustee asserts that courts "must" consider alternatives in order to determine whether the police power action is a necessity. This is incorrect both as a matter of law and of fact. First, the cases cited by the Trustee do not hold that courts "must" consider alternatives before making a necessity determination. To the contrary, the "mode or manner in which [the State may exercise the police power] is within the discretion of the State, subject, of course . . . that no rule prescribed by a State . . . shall contravene the Constitution of the United States or

infringe any right granted or secured by that instrument." *Jacobson v. Massachusetts*, 197 U.S. 11, 22 (1905). *See also Erie R. Co. v. Williams*, 233 U.S. 685, 700 (1914) ("Cost and inconvenience . . . would have to be very great before they could become an element in the consideration of the right of a state to exert its reserved power or its police power.").

Second, the Trustee's argument in favor of his supposed ExxonMobil option, an argument to which the Trustee pivoted on appeal after the Bankruptcy Court soundly rejected the supposed "alternatives" the Trustee advanced through its witness at trial (*i.e.,* that the Commission should have built a new processing facility up the coast or on a floating barge), flies in the face of the Bankruptcy Court's specific factual finding that no feasible alternatives were available to the Commission's operation of the EOF. JA59 (finding that "there was no evidence demonstrating that there were any alternatives to manage the $H_2S$ gas produced by the Wells in the meantime" and that "any available alternative would likely take a minimum of several years to be built," such that "[d]uring this time, while the Commission worked to obtain permits and construct an alternative to the EOF, it would still need to keep the EOF running to ensure that any buildup of annular gas at the Wells was pumped off to the EOF and treated"). The Commission's use of the EOF thus was never a matter of convenience, as the Trustee argues.

The District Court reached the same conclusion, finding that "[t]he existence of possible alternatives to assuming control of the EOF did not obviate the risk either. The Commission's ability to compel ExxonMobil to operate the privately owned EOF is unsupported by the record, as is the Trustee's speculation that ExxonMobil might have reached a commercial arrangement with Venoco in time to avert an emergency." JA24.

Third, even had the Commission the ability to compel ExxonMobil to conduct activities on the EOF, that still would not have compelled ExxonMobil or the Commission to have paid compensation. If the Commission's exercise of its police power is non-compensable, it would not matter that the Commission operated the EOF with State employees or through agents. Indeed, the Commission did, in fact, operate the EOF through an agent, Beacon West. *See* p. 12, *supra*. In no event would ExxonMobil have represented an alternative to the Commission's exercise of the police power, nor would the Trustee have been entitled to secure compensation for the operation of the EOF.

## III. ALTHOUGH THE TRUSTEE WAIVED THE ARGUMENT BELOW, EXTENSIVE PRECEDENT ESTABLISHES THAT THE STATE'S ENTRY ONTO PRIVATE PROPERTY THAT IS NECESSARY TO PROTECT THE PUBLIC DOES NOT GIVE RISE TO A COMPENSABLE TAKING.

As an afterthought, the Trustee raised in its reply brief before the District Court (and asserts again here) the contention that the Appellee's entry onto the

EOF was compensable because the EOF constituted "unoffending private property" that was being used to remedy a hazard – the peril posed by the emission of $H_2S$ gas – which had its origins at Wells located "at the State's own property." Tr. Br. at 20. The District Court correctly held that this argument had not been raised before the Bankruptcy Court, and thus waived, and had been further waived because it was raised belatedly in the Trustee's reply brief on appeal. JA25, n.10. Perhaps the best proof that Appellees had been sandbagged by this argument is provided by the Trustee himself, when he states that "neither the State . . . nor the lower courts cite any authority permitting the State's unpaid taking of unoffending private property to use as a tool to abate a hazard elsewhere." Tr. Br. at 20. As shown herein, had Appellees or the courts below had the opportunity to cite legal authority, they could have cited extensive legal authority upholding the principle that, so long as entry onto property was necessary to avert peril to the community, the question of compensability did not turn on whether the peril originated on the property itself. Finally, Appellees also do not leave unchallenged the Trustee's characterization of the EOF as "unoffending private property."

### A. The Trustee Waived Below the Contention that Entry Onto the EOF was a Compensable Taking Because it Was "Unoffending Property."

The Trustee engages in linguistic gymnastics to try to demonstrate the absence of waiver. Instead of showing where before the Bankruptcy Court it had

made the direct and straightforward legal argument that the State's entry onto the EOF was a compensable taking because $H_2S$ gas was piped there from another property and the EOF was unoffending private property, and presumably providing legal authority for that proposition, the Trustee contends he did not waive this argument by pointing to findings of fact, none of which (as the Trustee concedes) were ever contested. Tr. Br. at 43-45.

What the Trustee never argued before the Bankruptcy Court is that, as a result of these facts, there was a compensable taking. Had it been presented, Appellees would have contested it as matter of law, as well as on the basis that the EOF was anything but an "unoffending property." Especially given the District Court's extensive independent review of the Bankruptcy Court record, JA25, n.10 ("The Court did not locate this argument in the summary judgment briefing or elsewhere in the record.") (citations to the record omitted)), the Trustee presents no basis for concluding that the District Court either was clearly erroneous or abused its discretion in finding that the Trustee's legal contention had been waived before the Bankruptcy Court. *Id*. *See In re Natal*, 280 F. App'x 227, 229 (3d Cir. 2008) (issue not raised below is waived on appeal).

Moreover, the District Court correctly found that the Trustee had not raised the legal contention in its opening brief on appeal. JA25, n.10. The Trustee does not contest that conclusion in this Court but instead contends, on the basis of half a

sentence in Appellees' brief to the District Court, that Appellees had justified the Trustee raising the issue for the first time in its reply brief. Tr. Br. at 46-47. That half sentence from Appellee's brief reads as follows: "Perhaps, most importantly, none of the 'emergency' cases cited by the Trustee involved a risk _emanating_ from the property . . . ." JA2672 (emphasis in original). Based on such a slender reed, the District Court did not abuse its discretion in concluding that the Trustee had waived his legal contention by not raising it in his opening brief (an argument, by the way, that the Trustee falsely claimed he had raised in the Bankruptcy Court). *In re Revstone Indus*., LLC, 690 F. App'x 88, 90 (3d Cir. 2017) (arguments raised for first time in reply are waived on appeal).

### B. Extensive Legal Authority Upholds Entry Onto Private Property to Respond to an Impending Peril to the Community Even Though the Property Is Not the Site of or the Source of the Peril.

The Trustee cites no case authority to support his sweeping contention that governmental entry onto "unoffending property" constitutes a compensable taking even though such entry was found to be a necessary response to an impending peril, as was found here. No such authority is cited because, to the contrary, there exists extensive case authority upholding governmental entry onto adjacent and other "unoffending property" where such entry was needed to respond to a risk to public health, safety, and the environment, or otherwise necessary to the exercise

of the police power.  And nothing in this line of authority holds that such entry

gives rise to a compensable taking.

A leading authority upholding entry onto "unoffending property" is the

previously cited California Supreme Court's decision in *Property Reserve*.  In that

opinion, after listing numerous examples of entries onto private property not

undertaken in response to community peril, the Court declares: "[I]n the absence of

any connection with the construction or operation of a public improvement,

conducting such entries and activities on private property, even when such

activities result in damage to property, has not been considered to constitute the

taking of a compensable interest in property . . . ."  236 Cal. Rptr. 124 at 910.

Further cases upholding entry onto private property, which are not

themselves the source of community peril, include the following: *United States v.

Fisher*, 864 F.2d 434, 437 (7th Cir. 1988) ("CERCLA . . . authorizes the EPA to

enter property when 'there is a reasonable release or threat of release of a

hazardous substance or pollutant or contaminant.  The release (actual or

threatened) need not be on that property."); *U.S. v. City of New Orleans*, 86 F.

Supp.2d 580, 583, n.3 (E.D. La. 1999) ("The statute authorizes entry to any

property for the purpose of effectuating a response action."); *U.S. v. Mountaineer

Ref. Co.*, 886 F. Supp. 824, 828 (D. Wyo. 1995) ("Furthermore, when the EPA is

seeking entry to property, CERCLA 'makes no distinction between properties

containing hazardous substances and those that are merely adjacent to such properties.'"); *U.S. v. Charles George Trucking Co*., 682 F. Supp. 1260, 1273 (D. Mass. 1988) (Defendant "has not cited any authority for her contention that a more stringent standard applies with respect to the government's right to enter adjacent as opposed to source properties. There appears to be no such authority."). The issue of takings compensation is not raised in any of these cases and, of course, the fact that entry may be authorized by statute does not alter the duty to pay just compensation, if compensation is constitutionally required.

Common sense also leads one to reject the notion that the Commission's actions represent a case of "unoffending property [being] taken away from an innocent landowner" or a case where the government "merely appropriates a benefit from unoffending private property." Tr. Br. at 41-42 (citing *Mugler* and *Patty*). Neither cited case presents facts remotely similar to this case. Moreover, nothing is being taken away from a landowner nor is a benefit being appropriated where entry onto property is necessary to avert peril to the community. *Cedar Point Nursery*, 141 S. Ct. at 2079.

### C. The EOF is Not "Unoffending Property."

The premise of the Trustee's contention that the Commission's entry onto the EOF is a compensable taking because the EOF is "unoffending property" flies in the face of the Bankruptcy Court's unchallenged findings of fact. Whatever its

origin, it is incontrovertible that $H_2S$ flowed to the EOF through the interconnected pipelines that were in place when Venoco abandoned the Wells and facilities. The Commission had to enter onto the EOF regardless of where the $H_2S$ originated. Venoco and its Board, which included the Trustee (JA1005), knew some responsible party would have to enter onto the EOF to maintain and staff the treatment equipment when it abandoned the Wells and Platform Holly without first decommissioning the facilities and said it would no longer operate the EOF.

Venoco and its successor, the Trustee, had far greater knowledge of the risks posed by the interconnected nature of the Wells and the EOF, than, for example, the owner of land onto which pollution has migrated from adjacent (or even distant) property. Yet, case law establishes that even such a completely innocent landowner would be not be entitled to just compensation where the government is required to enter the property *either* because the "innocent" property was now being polluted *or* because entry onto the "innocent" property was necessary in order to treat the source of the pollution. *See* p. 52, *supra*.

Nor is this conclusion in any way impacted by the vesting of the EOF in the Trust, as the Trustee suggests. It is axiomatic that, pursuant to section 541 of the Bankruptcy Code, a bankruptcy estate includes only the legal or equitable interests of the debtor in property, but does not possess any greater rights to such property than the debtor held pre-petition. *See, e.g., Stewart v. Shubert*, 325 F. App'x 82,

84 (3d Cir. 2009) (holding that "the bankrupt estate obtains no greater ownership right than the debtor would have prior to the bankruptcy filing" and looking to applicable state law to determine the estate's interest in property) (quoting *Universal Bonding Ins. Co. v. Gittens & Sprinkle Enters., Inc.*, 960 F.2d 366, 372 (3d Cir. 1992)) (internal quotation marks and modifications omitted) (aff'd 325 Fed. Appx. 82 (3d Cir. 2009); *Integrated Sols. v. Serv. Support Specialties*, 124 F.3d 487, 494 (3d Cir. 1997) ("absent specific Congressional intent to preempt state law restrictions imposed on property of the estate, the trustee's rights in the estate property are limited to only those rights that the debtor possessed, or would have possessed, pre-petition."). Moreover, the vesting of the EOF initially in the bankruptcy estate, and then with the Venoco Trust, did not alter the interconnected nature of the EOF, Platform Holly, and the Wells, or eliminate the continuing need to staff and operate the EOF to prevent an uncontrolled release of $H_2S$. These were fundamental characteristics of the property, not "interests" in the property that the Trustee could take free and clear.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment of the District Court.

Respectfully submitted,

*/s/ David M. Fournier*
David M. Fournier (DE No. 2812)
Kenneth A. Listwak (DE No. 6300)
TROUTMAN PEPPER, LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, Delaware 19801
Telephone:   (302) 777-6500
E-mail:    David.Fournier@Troutman.com


*and*

Steven S. Rosenthal
Marc S. Cohen
John David Taliaferro
Alicia M. Clough
LOEB & LOEB LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Telephone:   (310) 282-2000
Email:    srosenthal@loeb.com
              mscohen@loeb.com
              jtaliaferro@loeb.com
              aclough@loeb.com

*Counsel for California State Lands Commission*

*and*

*/s/ Mitchell E. Rishe*
Rob Bonta
Attorney General of California
Christina Bull Arndt
Supervising Deputy Attorney General
Mitchell E. Rishe
Deputy Attorney General
OFFICE OF THE CALIFORNIA ATTORNEY GENERAL
300 S. Spring Street, Suite 1702
Los Angeles, CA 90013
Telephone: (213) 269-6394
E-mail: Mitchell.Rishe@doj.ca.gov
*Counsel for the State of California*

## COMBINED CERTIFICATIONS

**1.      Certification of Bar Membership**

Pursuant to L.A.R. 28.3(d) and 46.1(e), I hereby certify that I and Steven S. Rosenthal are each members in good standing of the bar of the United States Court of Appeals for the Third Circuit.

**2.      Certification of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,993 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

**3.      Certification of Service**

I hereby certify that on the July 15, 2024, I served or caused to be served this brief upon the following parties set forth below, in the manner indicated below:

**Email and Hand Delivery**
Morris, Nichols, Arsht & Tunnell
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899
Attn:  Robert J. Dehney
     rdehney@mnat.com
     Andrew R. Remming
     aremming@morrisnichols.com
     Matthew O. Talmo
     mtalmo@mnat.com

**Email and First Class Mail**
Institute for Justice
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
Attn:  Jeffrey H. Redfern
     jredfern@ij.org
     Christian W. Lansinger
     clansinger@ij.org

**Email and First Class Mail**
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002
Attn:  Warren W. Harris
     warren.harris@bracewell.com
     Mark E. Dendinger
     mark.dendinger@bracewell.com
     Nancy McEvily Davis
     nancy.davis@bracewell.com

4.     **Certification of Identical Compliance of Briefs**

Pursuant to L.A.R. 31.1(c), I hereby certify that the text of the electronic version of the foregoing brief filed via CM/ECF is identical to the text in the paper copies sent to the Court and served via first class mail.

5.     **Certification of Virus Check**

Pursuant to L.A.R. 31.1(c), I hereby certify that a virus detection program (Windows Defender ATP, Version: 1.415.14.0) was run on this PDF file and no virus was detected.

Date:  July 15, 2024          /s/ *David M. Fournier*
                                   David M. Fournier